## QUITZOW *v.* THE STATE.

1 THEFT.—The felonious intent, which is an essential to the crime of theft, must exist at the time of the taking; no subsequent felonious intent will render the previous taking theft.

2. SAME—CONSENT OF OWNER, if obtained by means of a false pretext, is no defense to the charge of theft, if the intention of the accused, at the time of the taking, was to divest the owner of his property.

3. SAME—EVIDENCE.—See the opinion of the court for a review of evidence which is held to be sufficient to prove a felonious intent in the hirer of a horse.

APPEAL from the District Court of Bexar.  Tried below before the Hon. GEORGE H. NOONAN.

The opinion states the case.

*C. K. Breneman*, for the appellant.  The appellant is not guilty of larceny.  He came lawfully into possession of the animal, under and by virtue of a contract for hire, and he did not convert the animal to his own use; on the contrary, he positively declined to sell or trade him.  In cases of this nature a conversion or appropriation by the prisoner must be proved.  The fact that the defend-

5

ant did not return at the time agreed upon is not sufficient to warrant a conviction. *White* v. *The State*, 11 Texas, 769; *Garcia* v. *The State*, 26 Texas, 210; Bishop on Cr. Law, vol. 1, secs. 568, 1014, 1017, 1019; Bishop on Cr. Law, vol. 2, sec. 815; Waterman's Archb. Cr. Pr. & Pl., vol. 2, 6th ed., sec. 373, and note.

Trespass is an element of the offense of larceny. There can be no trespass when there is consent to the taking when the legal possession passes to the prisoner, and when there is no subsequent conversion. Bishop on Cr. Law, vol. 2, secs. 817, 818, 838, 847, 863; Waterman's Archb. Cr. Pr. & Pl., vol. 2, 6th ed., secs. 371, 372, note 1.

A leading English case, *Regina* v. *Brooks*, S. C. & P. 295, reported in the volume last cited (sec. 373, note), is in point, and sustains this proposition. The facts were these: Brooks was indicted for stealing a horse and gig. It appeared that the prisoner, about half-past ten in the morning, hired a horse and gig of a livery-stable keeper in London, stating that he wanted them for two days, for the purpose of going down to Windsor. Instead of going to Windsor, he immediately drove in a contrary direction, to Rumford, in Essex, where he arrived at about twelve o'clock, and offered the horse and gig for sale to Mr. Orbell, the landlord at the King's Head Inn at that place, for £25. Mr. Orbell offered him £15, which the prisoner at first refused to accept, but, half an hour afterward, the gig being then in the yard and the horse in the stable, he told Mr. Orbell that he must let him have them for the sum offered, as he had been desired by his father to sell them before his return home. Mr. Orbell stated that the value of the horse and gig was at least £45, in consequence of which his suspicions were excited, and he did not intend to purchase them unless the prisoner gave him a satisfactory account of how he became possessed of them; that, after the prisoner agreed to accept the £15, those suspicions were increased, and he

asked further questions of the prisoner, and then, under pretense of going to fetch the money to pay the amount offered, he procured a constable and gave the prisoner into custody.

It was objected that the indictment for felony could not be sustained, as there had been no conversion. Conceding the hiring was only a pretense, made use of to obtain the horse and gig for the purpose of afterwards disposing of them, the possession, in law, still continued in the owner, and was not determined without a subsequent conversion, either actually proved, as in Pear's case and Charlewood's case, or to be presumed from the circumstances, as in Semple's case; and in the present case the subsequent conversion was incomplete, as the contract for the purchase was not concluded upon the part of Mr. Orbell.

Tindall, C. J. "This case comes near to many of those which have decided that the appropriation of property, under circumstances in some degree similar to the present, amounted to larceny. However, here there has been no actual conversion of the property, and only an offer to sell. I am of the opinion, therefore, that the prisoner must be acquitted."

*H. H. Boone,* Attorney General, for the State.

WHITE, J. About the last of March, 1875, the appellant hired a gelding from the livery-stable of one W. B. Newton, in Seguin, to go to the town of Leesburg, some eighteen miles distant, to tune a piano. He was to return that evening, or early the next morning. He did not go to Leesburg, but went to Helena, in Karnes county, a distance of fifty miles, and in a different direction to Leesburg.

He was arrested on the 15th day of April, three miles southwest of San Antonio, in Bexar county, where he was found in possession of the horse, and in the camp of a party of cattle drovers, to whom he had hired to drive cattle to Colorado.

When the deputy sheriff who arrested him arrived at the camp, and inquired for defendant, he was only a few steps off, lying under a wagon, with a book up before his face, partly concealing his face. The sheriff asked the man who seemed to be the spokesman of the party if Quitzow was in camp, when he answered no, he had left camp that morning. The sheriff then asked where the horses belonging to the party were, and, being informed they were " on herd, a short distance off," he sent Newton, a brother of the owner of the horse, out to the herd, whilst he remained in camp. Newton returned in a short time with the horse, having found him in the herd. The sheriff then called to the defendant, who was still under the wagon, to come out, as he believed he was the man he wanted ; and, when the defendant got up and came out, he asked him " Is not your name Quitzow?" He answered " Yes." The sheriff then said to him " Why did you not own up to your name when I first called for you?" Defendant replied " I thought if I said nothing I could get out of it, and you would not catch me ; but I see I had as well have owned up at first, as you have caught me." The defendant was then arrested, was indicted, and tried in the district court of Bexar county, found guilty of the theft of the animal, and his punishment assessed at five years in the penitentiary.

There was a motion for a new trial, which being overruled, defendant appealed, and assigns for error :

1st. That the court erred in refusing to charge the jury as requested by the defendant, and in the law actually given to the jury.

2d. The court erred in refusing to charge all the law applicable to the case.

3d. The court erred in overruling defendant's motion for a new trial.

Theft is defined to be " the fraudulent taking of corporeal personal property belonging to another, from his posses-

sion, or from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking." Pasc. Dig., Art. 2381.

This is the general definition of theft, and a proper construction relative to the intent, which is made a constituent element of the crime, is that "the felonious intent is an essential ingredient in the crime of theft, and this intent must exist at the time of taking; for no subsequent felonious intention will render the previous taking felonious." *Billard* v. *The State*, 30 Texas, 367; *Dignowitty* v. *The State*, 17 Texas, 527; 3 Greenl. on Ev., sec. 150.

This idea is also plainly expressed in another section of the statute, as follows: "The taking must be wrongful; so that, if the property came into the possession of the person accused of theft by lawful means, the subsequent appropriation of it is not theft." Art. 2385. The statute, however, does not stop here; but, in order to meet a class of cases too common, where the owner of the property, or the party holding the same for him, was induced to, and did, part with his property to a party who at the time intended to get his consent to a transfer of the possession, with the ultimate intention of appropriating it to his own use, it goes further, and expressly provides: "But if the taking, though originally lawful, was obtained by any false pretext, or with an intent to deprive the owner of the value thereof and appropriate the property to the use and benefit of the person taking, and the same is so appropriated, the offense is complete." Pasc. Dig., Art. 2385. There is no repugnance or inconsistency beween the two Articles quoted.

The taking, as defined in this latter Article (2385), does not describe a different offense from that defined by Article 2381, but only differs in its facts and circumstances, which

are matters of proof, and need not be averred in the indictment. *Maddox* v. *The State*, 41 Texas, 205 ; *White* v. *The State*, 11 Texas, 769 ; *Smith* v. *The State*, 35 Texas, 738.

The plain construction to be placed upon the statute is that the consent of the owner, obtained under any false pretext, would not be a defense on the charge of theft if it were made to appear that the intention really was to divest him of his property. *Maddox* v. *The State*, 41 Texas, 205. And this, it seems, is no new innovation upon the rules of evidence applicable to cases of theft. 3 Greenl. on Ev., sec. 160.

Mr. Bishop, in his valuable work, drawing the distinction, and giving the reason for the rule which prevails in the law for this class of cases, says : " If a man, meaning to steal his neighbor's goods, fraudulently prevails on his neighbor to deliver them to him, under the understanding that the property therein is to pass, he commits neither larceny nor any other crime by the taking, unless the transaction amounts to an indictable cheat. But if, with the like intent, he fraudulently gets leave to take the possession only, and takes and converts the property in the goods, he becomes guilty of larceny ; because, while his intent is thus to appropriate the property, the consent which he fraudulently obtained covers no more than the possession." 1 Bishop on Cr. Law, sec. 1017.

Again, the same author says : " But a consent, to avail the defendant, must be to the taking of the property in the goods—not merely to a transfer of the possession, or a parting with the use of them. The reason is that larceny is committed only when the aim of the thief is to divest the owner of his ownership, in distinction from the mere use or temporary possession ; so that a consent which comes short of this necessary intent covers not the whole ground of the taking, and avails nothing. For example, if with felonious

mind one borrows or hires a horse or carriage, as he pre-
tends, to ride, etc., his concurrent intent being, let us still
remember, to steal the thing, he commits, notwithstanding
this consent of the owner, the crime of larceny." 2 Bishop
on Cr. Law, sec. 818; *State* v. *Gorman*, 2 Nott & M.
(S. C.) 90.

After defining theft and its punishment, the court charged
the jury that, "in order to convict the defendant, you must
be satisfied from the evidence that his original intention was
to obtain possession of the gelding, by the false pretext of
hiring, and then to appropriate the animal to his own use;"
and, further, "if you have a reasonable doubt of the guilt
of the defendant, you will give him the benefit of the doubt,
and acquit him."

We think this instruction presented the essential points
in the case concisely and fairly to the jury; and, whilst the
charge, as a whole, might perhaps have been fuller, we are
not prepared to say that it did not present all the law
applicable to the case.

As to defendant's intention of permanent conversion and
appropriation of the property, the evidence adduced fully
warranted the jury in arriving, as they did, at an affirmative
conclusion. In addition to the facts above stated, Charles
Johnson testified that the defendant had placed the horse in
his lot in order that he (witness) might doctor him for a
sore back; that the horse stayed in the lot several days.
"That he never heard the defendant speak of his having
been at Seguin, or that the horse was not his own, or
belonged to a man at Seguin. He always spoke of the
horse as his own." And Schrœder, another witness, says:
"I understood from them (defendant and another party)
that they were going to Colorado or California with some
cattle men. Defendant never told me he was from Seguin,
or that he had ever been there. He told me he came from
Helena. He claimed the horse as his property."

We see nothing in the record which calls for a reversal of the case; the judgment of the lower court is, therefore, affirmed.

*Affirmed.*